RONALD E. ARMSTRONG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ARLENE E. ARMSTRONG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Armstrong v. Commissioner
Docket Nos. 10307-77, 10308-77.
United States Tax Court
T.C. Memo 1980-548; 1980 Tax Ct. Memo LEXIS 36; 41 T.C.M. (CCH) 524; T.C.M. (RIA) 80548; December 10, 1980
Ronald E. Armstrong, pro se. Matthew W. Stanley, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in and additions to the Federal income tax of petitioners: Docket
Taxable
No.
Petitioner
Year
Deficiency
10307-77
Ronald E.
1972
$ 1,250
Armstrong
1973
4,781
1974
2,454
1975
3,268
10308-77
Arlene E.
1972
$ 448
Armstrong
1973
3,917
1974
1,224
1975
1,911
*37 Docket
Additions to Tax, I.R.C. 1954 [1]
No.
Sec. 6651(a)
Sec. 6653(a)
10307-77
$ 313
$ 63
1,195
239
614
123
817
163
10308-77
$ 112
$ 22
979
196
306
61
478
96
Most of the issues have been settled, leaving for our determination the question whether petitioner Ronald Armstrong's (hereinafter Ronald) sales of certain real estate parcels resulted in ordinary income or capital gain. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. At the time their petitions were filed herein, petitioners resided, as husband and wife, in Hoquiam, Washington. Ronald worked for a lumber company as a log buyer for a period of years prior to August 1971, when his employment with that company ended. He drew unemployment for two or three months in early 1972, and thereafter his income was derived primarily from finder's fees earned by locating land and timber for a man and from the sale of land. In September 1969, Ronald and his father, *38 Orville Armstrong, purchased from a third party at a cost of $40,000 a parcel of land measuring aproximately 130 acres. A highway divides the parcel into what will be called the North and South Portions. At the time of purchase, a county road existed upon the South Portion but there was no road on the North Portion. Shortly after purchasing the property, both the North and South Portions were subdivided by legal description into 26 five-acre lots. The approximate corners of the lots were marked by sticks with pieces of ribbon attached. In 1969, the 130-acre parcel was listed with a real estate agency for sale by lot. The agency actively undertook to sell the lots on Ronald's behalf. Ronald worked for this agency for a few months in 1971 and, as its employee, attempted to sell the lots. He instructed the agency not to sell any of the northern lots until all of the southern lots had been sold. Shortly after Ronald and his father purchased the land, the real estate agency posted signs on it advertising the lots for sale. Ronald erected a large sign north of the highway describing "Five-Acre Tracts For Sale, Easy Terms." In 1970, Ronald constructed a road on the North *39 Portion to provide access to several of the subdivided lots. Between April 1970 and August 1973, 25 of the 26 lots were sold. None of the northern lots were sold until September 1971; however, after the sale of a number of the northern lots, 2 southern lots were sold in 1973. As compared with his other sources of income, Ronald's earnings from the sale of the lots were significant. OPINION The applicable law is well settled. As in effect during the taxable years in issue, section 1222 provided as follows: SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES. For purposes of this subtitle-- (3) LONG-TERM CAPITAL GAIN.--The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months * * *. (4) LONG-TERM CAPITAL LOSS.--The term "long-term capital loss" means loss from the sale or exchange of a capital asset held for more than 6 months * * *. (7) NET LONG-TERM CAPITAL GAIN.--The term "net long-term capital gain" means the excess of long-term capital gains for the taxable year over the long-term capital losses for such year. Section 1202 provided: SEC. 1202. DEDUCTION FOR CAPITAL GAINS. In the *40 case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 percent of the amount of such excess shall be a deduction from gross income. There is no question but that Ronald and his father held each lot for over 6 months prior to selling it. Thus, the only real issue is whether the lots were "capital assets" when they were sold. If so, their sale gave rise to long-term capital gain which qualifies for the deduction; if not, the sales produced ordinary income with respect to which no special deduction was available. Section 1221 defined the term "capital asset" as follows: [The] term "capital asset" means property held by the taxpayer * * * but does not include-- (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *. Respondent contends that all of the lots were held by Ronald and his father (hereinafter, Ronald will be referred to as the owner) for sale to customers in the ordinary course of business. Petitiiners, on brief, seem to concede that the South Portion was so held, but contend that the North Portion was *41 held as an investment. We agree with respondent. The Supreme Court has stated that-- the purpose of the statutory provision * * * is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other. [.] The taxpayer has the burden of proving that the property sold was a capital asset in his hands, the issue being determined by the facts of each case. We have, in the past, enumerated several factors to guide our inquiry, including: (1) the purpose for which the property was initially acquired; (2) the extent of improvements made by the taxpayer to the property; (3) the frequency, number, and continuity of sales; (4) the ordinary business of the taxpayer; (5) the extent of advertising or other active efforts used in soliciting buyers; (6) the listing of property with brokers; and (7) the purpose for which the property is held at the time of sale. . While the purpose for the *42 acquisition is relevant, intent is subject to change, and the determining factor is the purpose for which the property is held at the time of sale. . Based upon our consideration of the record in light of the foregoing principles, we conclude that all of the lots were held by petitioner for sale to customers in the ordinary course of business. Petitioners have already conceded the issue as to the southern lots. As to the North Portion of the tract, they argue that the lots were not subdivided and sold until September 1971, two years after the entire parcel was purchased, and then only because of financial need. However, Ronald testified that he built the access road on the North Portion in 1970. It is difficult to see how he could have known where to put the road unless the lots on that part of the tract had already been demarcated. Further, and more importantly, at no time during the trial did Ronald testify that he and his father held the North Portion for investment, even in the face of direct questioning. Even if the North Portion were initially considered as an "investment" when acquired, we feel *43 that Ronald's subsequent actions with respect to it evidence the sort of change of intent described in He subdivided it into lots and sold them. The sales were frequent, averaging over 5 lots per year, and continuous. The income derived from selling the lots was substantial as compared to his other earnings. He posted a sign on the north side of the highway advertising "Five-Acre Lots, Easy Terms." He listed the property with a real estate agency, and, as an employee of that agency, actively attempted to sell the lots. We fail to see any substantive difference between his behavior relative to the South and North Portions of the parcel. For aught that appears of record, the sales of lots on both sides of the highway were part of an integrated subdivision scheme. We so hold. It follows that, as the lots were held for sale to customers in the ordinary course of Ronald's business, none of them were "capital assets" within the meaning of section 1221. Due to concessions, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩